IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

|  |  |
|---|---|
| GEORGE GILBERT HILL, III,<br><br>Petitioner,<br><br>vs.<br><br>WARDEN SHELBIE SMITH,<br><br>Respondent. | CASE NO. 4:25-cv-1408<br><br>DISTRICT JUDGE<br>J. PHILIP CALABRESE<br><br>MAGISTRATE JUDGE<br>JAMES E. GRIMES JR.<br><br>**REPORT AND<br>RECOMMENDATION** |

George Gilbert Hill, III, filed a pro se Petition under 28 U.S.C. § 2254 for a Writ of Habeas Corpus. Doc. 1. Hill is currently in custody at the Belmont Correctional Institution serving a sentence of imprisonment of 15 years to life imposed by the Mahoning County Court of Common Pleas in *State v. Hill*, Case No. 20cr757. The Court referred this matter to a Magistrate Judge under Local Rule 72.2 for the preparation of a Report and Recommendation. For the following reasons, I recommend that the Court deny Hill's petition.

## Summary of underlying facts

In habeas corpus proceedings brought under 28 U.S.C. § 2254, factual determinations made by state courts are presumed correct. 28 U.S.C. § 2254(e)(1). "This presumption also applies to the factual findings that [a] state appellate court makes on its review of the state trial record." *Johnson v. Bell*,

525 F.3d 466, 474 (6th Cir. 2008). The petitioner has the burden of rebutting

that presumption by clear and convincing evidence. *Id.*

The Ohio Court of Appeals for the Seventh Appellate District

summarized the facts underlying Hill's conviction following his trial as follows:

> {¶2} Appellant and J.M. were in a relationship, and
> Appellant was living in J.M.'s house. During their
> relationship, multiple friends of J.M. observed she
> had various injuries that caused them to be
> concerned for her safety. One friend, E.E., testified
> that she regularly observed bruises on J.M. E.E.
> testified that J.M. also had black eyes on several
> occasions, which J.M. attempted to cover with
> makeup and dark sunglasses. E.E. testified that the
> last time she saw J.M. alive, she noticed an injury
> that particularly concerned her, "it was a bruise and
> it was on the whole side of her face from up here all
> the way down like (indicating). She got real nervous
> and she wouldn't look me in the eyes." (Trial Tr., p.
> 513.)
>
> {¶3} J.M.'s best friend, D.C., testified that sometime
> after J.M. began dating Appellant, she noticed a
> change in her behavior. "She stopped coming around
> as much. I had asked her to go out and she would,
> like, make up excuses. They actually – he would
> come out a lot, too, with us, and then it just stopped."
> (Trial Tr., p. 553) The few times J.M. would stop at
> her house, D.C. believed she had "snuck out" and did
> not want Appellant to know she was there. Similar
> to E.E., D.C. saw various injuries on J.M. and often
> noticed J.M. wearing sunglasses, even when indoors.
>
> {¶4} Two incidents stood out to D.C. Once she
> observed a significant bruise from the victim's
> buttocks down her entire leg. Although J.M.
> conceded that Appellant caused the injury when he
> pushed her down a set of porch stairs, she refused to
> allow D.C. to photograph the injury. On another
> occasion, J.M. and Appellant appeared at D.C.'s
> house party. J.M. hugged her and teared up. D.C.

2

asked her what was wrong, but Appellant had noticed the encounter and announced that it was time to leave. D.C. testified that "[t]hey went upstairs. He was very angry. So I followed. And she kind of turned around to, like, say she wanted to stay and he kind of took her by the hair and pushed her." (Trial Tr., p. 559)

{¶5} On May 31, 202[0], Appellant and J.M. went to the Steel Valley Bar and Grill, an establishment that they regularly visited. Appellant originally told law enforcement that they left the bar at 2:00 a.m. because J.M. got into a fight with the bartender. He later changed his story after videos showed they were at home around 11:00 p.m. He then claimed they argued once they arrived home about J.M.'s fight with the bartender. He said she was highly intoxicated, and videotaped J.M. stumbling around the house as evidence. He said she consumed six or seven long island iced tea drinks while at the bar. However, the bartender, C.T., testified that she did not argue with J.M. on that night or any other. In fact, C.T. described J.M. as quiet and reserved, and said she only spoke to two people. C.T. testified that J.M. never ordered long island iced teas but regularly ordered Tito's with Sprite. D.C. confirmed that this is what J.M. typically drank.

{¶6} Appellant conceded to law enforcement that he and J.M. "got into it" that night. (Trial Tr., p. 402.) However, officers were unclear whether he meant they engaged in a physical or verbal altercation. Regardless, Appellant told them that at some point, J.M. stumbled in the bathroom, fell, and hit her head on the toilet. He gave her a towel for the blood and asked if she wanted to go to the hospital, but she declined.

{¶7} Detective Greg Stepuk testified Appellant told him that the morning after the incident:

> [H]e woke up, saw that she was in distress, snoring real loudly, is how he was saying it. She wouldn't wake up. He was trying to rouse

3

her. She wouldn't wake up. He did describe something with -- and I believe Attorney Wise brought this up -- with the spoon. He was explaining how he was trying to help her breathe or whatever, putting this or prying into her mouth or something along those lines. This happened before he called 911, or that probably happened within an hour before 911 was notified.

(Trial Tr., p. 403.)

{¶8} Appellant admitted to the responding officers that, despite J.M.'s apparent dire condition, he waited one to two hours before he called 911. In explanation, he claimed that his phone could not make outgoing calls and he was forced to charge J.M.'s phone in order to use it for the 911 call. The officers found this explanation odd, noting that a cellular phone charges fairly quickly, and can be used after minimal charging. Appellant also claimed that J.M. did not want to go to the hospital the night before, so he was reluctant to call for help in order to honor her wishes. Also, prior to calling 911, Appellant called D.C. four or five times. Appellant claims that he made the call to 911 an hour or two after he woke up.

{¶9} Sydney Livermore, an EMT, responded to the dispatch call. She assumed that the incident involved a drug overdose due to J.M.'s age and the information provided as to her condition. Once she saw J.M., Livermore changed her mind, because "you couldn't move her limbs. She was seizing so she was very rigid, and she was nonresponsive to any stimuli." (Trial Tr., p. 294.) Appellant, who was "fairly relaxed," provided limited information to Livermore's questions, which surprised her. Based on her experiences, most people attempt to give as much information as they are able following the need for emergency help. Livermore did not detect any odor of alcohol coming from J.M. She noticed J.M. had a gash and bloody, matted hair on the back of her head. When she removed J.M. from the bed,

4

the fitted sheet came off and she noticed the mattress was soaked in blood.

{¶10} Officer Jamison Diglaw of the Boardman Police Department testified that he asked Appellant to see his phone multiple times, but Appellant never gave him the phone. He also testified that he asked to photograph areas in the house, but Appellant "declined any -- allowing me to do any type of photography or collect any evidence." (Trial Tr., p. 318) He also noted that Appellant seemed reluctant to provide much information.

{¶11} Around 7:25 a.m., shortly after J.M. arrived at the hospital, nurses obtained a blood sample, then a urine sample around 8:40 a.m. Neither of these contained a meaningful level of alcohol, showing she had consumed approximately one-half of an alcoholic beverage. The only drugs found in her system were administered by hospital staff.

{¶12} While the officers were still at the scene, someone from St. Elizabeth's hospital called and asked for police personnel to document certain injuries they discovered on J.M.'s body. Dispatch sent Officer Daniel Baker of the Boardman Police Department to the hospital. The nurses positioned J.M.'s body to allow Officer Baker to photograph the injuries of concern. Officer Baker testified that he followed the lead of the nurses. He documented what they told him to and did not decide, himself, which areas of J.M.'s body to photograph.

{¶13} At some point after J.M. was taken to the hospital, D.C. awoke and found she had missed calls placed with J.M.'s phone. Concerned, she called J.M., but Appellant answered. He calmly informed her that J.M. was in a coma at the hospital. D.C. hung up and immediately called J.M.'s family, where she learned of J.M.'s grim condition. J.M. was not expected to survive, and even if she did, would undoubtedly reside in a nursing facility the remainder of her life.

5

{¶14} J.M. did not survive. Dr. Joseph Felo performed an autopsy and determined the manner of death was homicide. On [J.M.]'s head, alone, he discovered trauma associated with three distinct injuries: one to the left side of her head, one to the back of her head, and one to the right of her head. He found nineteen bruises to the trunk area, but could not give a definitive count as to her extremities because in several areas the bruises were clustered. Some of these appeared new, and others appeared to be older and healing. He performed a drug and alcohol test using a blood sample and found no drugs were in the sample but it had an ethanol level of .012, about one-half of an alcoholic beverage. He testified that six or seven long island iced tea drinks would take approximately twenty-four hours to dissipate for purposes of alcohol testing. Hence, it was impossible she consumed the drinks Appellant alleged she had on the night of the incident, which was less than ten hours before the blood sample was taken.

{¶15} On December 10, 2020, Appellant was indicted on one count of murder, an unclassified felony in violation of R.C. 2903.02(A), (D), R.C. 2929.02(B); one count of murder, an unclassified felony in violation of R.C 2903.02(B), (D); one count of felonious assault, a felony of the second degree in violation of R.C. 2903.11(A)(1), (D)(1)(a); and one count of domestic violence, a felony of the fourth degree in violation of R.C. 2919.25(A), (D)(3).

{¶16} At trial, the state presented testimony from several witnesses, notably the responding officers (EMT Livermore, Officer Diglaw, Officer Baker, Det. Stepuk), the emergency room doctor (Dr. Chad Donley), the coroner (Dr. Felo), the bartender (C.T.) and J.M.'s friends (E.E. and D.C.). Dr. Anthony Pizon (toxicology expert) and J.M.'s father were witnesses called by Appellant. Following trial, the jury convicted Appellant on all counts as charged in the indictment.

{¶17} On June 6, 2022, the trial court filed its sentencing entry. The court determined that all four counts merged for purposes of sentencing and the state elected to proceed on count two, murder. The court imposed fifteen years to life of imprisonment with credit for 473 days served.

*State v. Hill*, 2024-Ohio-1543, 2024 WL 1718027, at *1–3  (Ohio Ct. App. 2024).

## Procedural background

After the trial court entered judgment, Hill filed a notice of appeal. Doc. 9-1, at 45. In his supporting brief, Hill raised five assignments of error:

1. The trial court erred as a matter of law and to the prejudice of Appellant by failing to provide a fair cross section representative of the community from the jury pool resulting in a violation of Appellant's right to a jury free from racial bias and to be tried by a cross section of the community and by his peers.

2. The trial court erred as a matter of law and to the prejudice of Appellant by permitting Appellee to introduce impermissible prior bad acts evidence over objection from Appellant contrary to Rule 404(b) of the Ohio Rules of Evidence.

3. The trial court denied Appellant due process under the Fourteenth Amendment due to the fact that his convictions for murder, felonious assault and domestic violence were against the manifest weight of the evidence and the jury's verdict was inconsistent with the evidence and testimony presented at trial.

4. The trial court erred as a matter of law and to the prejudice of Appellant by admitting into evidence duplicative and gruesome photographs of the victim over objection from counsel.

5. Appellant's sentence is unconstitutional pursuant to Reagan Tokes law, R.C. 2967.271, as

7

> it violates the seperation of powers doctrine and the Equal Protection Clause of the United States and Ohio Constitutions.[1]

Doc. 9-1, at 50–51. In March 2024, the Ohio court of appeals affirmed the trial court. *Hill*, 2024 WL 1718027.

Hill later filed a notice of appeal with the Ohio Supreme Court. Doc. 9-1, at 135–36. In his memorandum in support of jurisdiction, Hill raised four propositions of law:

> 1. The trial court and the Seventh District Court of Appeals erred as a matter of law and to the prejudice of Appellant by failing to provide a fair cross section representative of the community from the jury pool resulting in a violation of Appellant's right to a jury free from racial bias and to be tried by a cross section of the community and by his peers.

> 2. The trial court and the Seventh District Court of Appeals erred as a matter of law and to the prejudice of Appellant by permitting Appellee to introduce impermissible prior bad acts evidence over objection from Appellant contrary to Rule 404(b) of the Ohio Rules of Evidence.

> 3. The trial court and the Seventh District Court of Appeals denied Appellant due process under the Fourteenth Amendment due to the fact his convictions for murder, felonious assault and domestic violence were against the manifest weight of the evidence and the jury's verdict was inconsistent with the evidence and testimony presented at trial.

> 4. The trial court and the Seventh District Court of Appeals erred as a matter of law and to the prejudice of Appellant by admitting into evidence duplicative

---

[1]     Unless noted, Hill's assignments of error, propositions of law, and grounds for relief are reproduced as written.

and gruesome photographs of the victim over objection from counsel.

Doc. 9-1, at 141–42. On June 25, 2024, the Ohio Supreme Court declined under Rule 7.08(B)(4) of its rules of practice to accept jurisdiction. *Id.* at 196.

*Federal habeas proceedings*

Hill filed a petition for writ of habeas corpus on June 18, 2025. Doc. 1, at 17; *see Houston v. Lack*, 487 U.S. 266, 270 (1988) (holding that an imprisoned petitioner's petition is deemed filed when he places it in his prison's mailing system). He raises the following four grounds for relief:

> GROUND ONE: The trial court denied Petitioner due process under the Fourteenth Amendment due to the fact his convictions for murder, felonious assault and domestic violence were against the manifest weight of the evidence and the jury's verdict was inconsistent with evidence and testimony presented at trial.
>
> GROUND TWO: The trial court erred as a matter of law to the prejudice of Petitioner by permitting Appellee to introduce impermissable prior bad acts evidence over objection from Petitioner contrary to Rule 404(B) of the Ohio Rules of Evidence.
>
> GROUND THREE: The trial court erred as a matter of law and the prejudice of petitioner by failing to provide a fair cross section representative of the community from the jury pool resulting in a violation of Petitioner's right to a jury free from racial bias and to be tried by a cross section of the community and by his peers.

> GROUND FOUR: The trial court erred as a matter of law and to the prejudice of the Petitioner by admitting into evidence duplicative and gruesome photographs of the victim over objection from Petitioner.

Doc. 1, at 8–14. The Warden filed a return. Doc. 9. Hill did not file a traverse.[2]

## Legal Standard

Under the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. 104-132, § 104, 110 Stat. 1214 (AEDPA or "the 1996 Act"), habeas petitioners must meet certain procedural requirements to have their claims reviewed in federal court. *Smith v. Ohio Dep't of Rehab. & Corr.*, 463 F.3d 426, 430 (6th Cir. 2006). "Procedural barriers, such as statutes of limitations and rules concerning procedural default and exhaustion of remedies, operate to limit access to review on the merits of a constitutional claim." *Daniels v. United States*, 532 U.S. 374, 381 (2001). Although procedural default is sometimes confused with exhaustion, exhaustion and procedural default are distinct concepts. *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006). Failure to

---

[2] After the Court denied Hill's Motion to expand the record, the Court received Hill's reply brief to that motion, Doc. 15. I have reviewed this brief, but the arguments Hill presents in it do not change the Court's ruling on the motion to expand. To the extent that Hill presents argument in this brief that are responsive to the Respondent's Return of Writ, *see, e.g.*, Doc. 15, at 6, I have considered these arguments as a traverse when evaluating the petition. Finally, to the extent that Hill attempts to raise an actual innocence claim in this filing, Doc. 15, at 5, 12–13, he did not do so in his petition. *See Tyler v. Mitchell*, 416 F.3d 500, 504 (6th Cir. 2000) (claims raised for the first time in a traverse are improper). Moreover, there is no stand-alone actual innocence claim in federal habeas. *See Cress v. Palmer*, 484 F.3d 844, 854 (6th Cir. 2007) (stand-alone actual-innocence claims are not cognizable in habeas).

exhaust applies when state remedies are "still available at the time of the federal petition." *Id.* (quoting *Engle v. Isaac*, 456 U.S. 107, 125 n.28 (1982)). But when "state court remedies are no longer available to a petitioner because he or she failed to use them within the required time period, procedural default and not exhaustion bars federal court review." *Id.*

*Exhaustion*

A federal court may not grant a writ of habeas corpus unless the petitioner has exhausted all available remedies in state court. 28 U.S.C. § 2254(b)(1)(A); *Robinson v. Horton*, 950 F.3d 337, 343 (6th Cir. 2020). To exhaust his remedies, a state defendant with federal constitutional claims must "fairly presen[t]" those claims to the state courts before raising them in a federal habeas corpus action. *Robinson*, 950 F.3d at 343 (quoting *Duncan v. Henry*, 513 U.S. 364, 365 (1995)); *see also Fulcher v. Motley*, 444 F.3d 791, 798 (6th Cir. 2006). A constitutional claim for relief must be presented to the state's highest court to satisfy the fair presentation requirement. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 845–48 (1999); *Caver v. Straub*, 349 F.3d 340, 345 (6th Cir. 2003). And a habeas petitioner must "present[] both the factual and legal basis for [the] claims to the state courts." *Hanna v. Ishee*, 694 F.3d 596, 606 (6th Cir. 2012). This means that the "'petitioner must present his claim to the state courts as a federal constitutional issue—not merely as an issue arising under state law.'" *Williams*, 460 F.3d at 806 (quoting *Koontz v. Glossa*, 731 F.2d 365, 368 (6th Cir. 1984)). "'[G]eneral allegations of the denial of rights to

11

a "fair trial" and "due process" do not "fairly present claims" that specific constitutional rights were violated.'" *Hand v. Houk*, 871 F.3d 390, 418 (6th Cir. 2017) (quoting *Slaughter v. Parker*, 450 F.3d 224, 236 (6th Cir. 2006)).

*Procedural default*

Procedural default may occur in two ways. *Williams*, 460 F.3d at 806. First, a petitioner procedurally defaults a claim by failing "to comply with state procedural rules in presenting [the] claim to the appropriate state court." *Id.* In *Maupin v. Smith*, the Sixth Circuit directed courts to consider four factors when determining whether a claim is barred on habeas corpus review because a petitioner failed to comply with a state procedural rule: whether: (1) there is a state procedural rule applicable to the petitioner's claim and whether the petitioner failed to comply with that rule; (2) the state court enforced the procedural rule; (3) the state procedural rule is an adequate and independent state ground on which the state can foreclose review of the federal constitutional claim; and (4) the petitioner can demonstrate cause for failing to follow the rule and actual prejudice by the alleged constitutional error. 785 F.2d 135, 138 (6th Cir. 1986); *see also Williams*, 460 F.3d at 806 ("If, due to the petitioner's failure to comply with the procedural rule, the state court declines to reach the merits of the issue, and the state procedural rule is an independent and adequate grounds for precluding relief, the claim is procedurally defaulted.") (citing *Maupin*, 785 F.2d at 138).

12

Second, "a petitioner may procedurally default a claim by failing to raise a claim in state court and pursue that claim through the state's 'ordinary appellate review procedures.'" *Williams*, 460 F.3d at 806 (quoting *O'Sullivan*, 526 U.S. at 848); *see Woolbright v. Crews*, 791 F.3d 628, 631 (6th Cir. 2015) ("When a petitioner has failed to fairly present … claims to the state courts and no state remedy remains, [the] claims are considered to be procedurally defaulted.") (citing *Gray v. Netherland*, 518 U.S. 152, 161–62 (1996)). While the exhaustion requirement is technically satisfied in this circumstance because state remedies are no longer available to the petitioner, *see Coleman v. Thompson*, 501 U.S. 722, 732 (1991), a petitioner's failure to have the federal claims considered in the state courts constitutes a procedural default of those claims that bars federal court review, *Williams*, 460 F.3d at 806.

To overcome a procedural bar, a petitioner must show "cause for the default and actual prejudice as a result of the alleged violation of federal law," or show that a "fundamental miscarriage of justice" will result if the petitioner's claims are not considered. *Coleman*, 501 U.S. at 750.

*Merits review*

If a state's courts adjudicated the merits of a claim, a habeas petitioner may obtain habeas relief under 28 U.S.C. § 2254, if the petitioner can establish one of two predicates. To establish the first predicate, the petitioner "must identify a 'clearly established' principle of 'Federal law' that" has been established by a holding of the Supreme Court. *Fields v. Jordan*, 86 F.4th 218,

13

231 (6th Cir. 2023) (en banc); *see* 28 U.S.C. § 2254(d)(1). The petitioner must then show that the state court's adjudication "was contrary to," or "involved an unreasonable application of" that "clearly established" precedent. 28 U.S.C. § 2254(d)(1); *see Fields*, 86 F.4th at 232.

To establish the second predicate, the petitioner must show that the state's court's adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by the [United States Supreme] Court on a question of law or" based on "a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000). "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from th[e] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "[A]n 'unreasonable application of'" the Court's holdings is one that is "'objectively unreasonable,' not merely wrong; even 'clear error' will not suffice." *White v. Woodall*, 572 U.S. 415, 419 (2014) (quoting *Lockyer v. Andrade*, 538 U.S. 63, 75–76 (2003)).

"[A] 'clearly established' principle of 'Federal law'" refers to the "holdings," not "dicta," of the Supreme Court's decisions. *Fields*, 86 F.4th at 231 (quoting 28 U.S.C. § 2254(d)(1) and *Woodall*, 572 U.S. at 419). A state court

14

need not cite Supreme Court precedent or reflect an "awareness" of Supreme Court cases, "so long as neither the reasoning nor the result of the state-court decision contradicts" such precedent. *Early v. Packer*, 537 U.S. 3, 8 (2002); *see Lopez v. Wilson*, 426 F.3d 339, 358 (6th Cir. 2005). If the Supreme Court has not addressed the petitioner's specific claims, a reviewing district court cannot find that a state court acted contrary to, or unreasonably applied, Supreme Court precedent or clearly established federal law. *Carey v. Musladin*, 549 U.S. 70, 77 (2006); *see White*, 572 U.S. at 426 ("Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably applies this Court's precedent; it does not require state courts to extend that precedent or license federal courts to treat the failure to do so as error.").

In determining whether the state court's decision involved an unreasonable application of law, the Court uses an objective standard. *Williams*, 529 U.S. at 410. "A state court's determination that a claim lacks merit precludes federal habeas review so long as 'fair-minded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)); *see also Bray v. Andrews*, 640 F.3d 731, 738 (6th Cir. 2011). "[A] state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Harrington*, 562 U.S. at 103.

15

## Discussion

> *1.    Hill's first ground for relief is not cognizable in part and otherwise meritless.*

In his first ground for relief, Hill asserts that he was denied due process because his convictions "were against the manifest weight of the evidence and the jury's verdict was inconsistent with evidence and testimony presented at trial." Doc. 1, at 8. As an initial matter, manifest-weight-of-the-evidence claims are state-law issues that are not cognizable in federal habeas proceedings.[3] *See Johnson v. Havener*, 534 F.2d 1232, 1234 (6th Cir. 1976). To the extent, therefore, that Hill presents a manifest-weight-of-the-evidence argument, his claim is not cognizable in this forum.

Hill presented his manifest-weight claim to the Ohio Supreme Court and the Ohio Court of appeals. *See* Doc. 9-1, at 50, 141. The Sixth Circuit has held that a manifest-weight-of-the-evidence claim presented on direct review to an Ohio court of appeals can suffice to preserve an insufficient-evidence

---

[3]    A manifest-weight-of-the-evidence claim presents an issue of state law. Under Ohio law, "[w]eight of the evidence concerns 'the inclination of *the greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the other.'... When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." *State v. Thompson*, 678 N.E.2d 541, 546–47 (Ohio 1997) (citations omitted). But a federal habeas court can't "reweigh the evidence or redetermine the credibility of the witnesses whose demeanor has been observed by the trial court" because, in habeas proceedings, "[i]t is the province of the factfinder to weigh the probative value of the evidence and resolve any conflicts in testimony." *Matthews v. Abramajtys*, 319 F.3d 780, 788 (6th Cir. 2003) (citations omitted).

16

argument. *Nash v. Eberlin*, 258 F. App'x. 761, 765 (6th Cir. 2007) ("the determination by the Ohio Court of Appeals that the conviction was supported by the manifest weight of the evidence necessarily implies a finding that there was sufficient evidence"). So Hill's first ground can fairly be construed to include a claim that the evidence was insufficient to support his convictions.

In reviewing the sufficiency of the evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). This "standard 'gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011) (en banc) (quoting *Jackson*, 443 U.S. at 319). In applying the standard, the court defers to the trier-of-fact's determination. *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009). The court does "not reweigh the evidence, re-evaluate the credibility of witnesses, or substitute [its] judgment for that of the [fact-finder]." *Id.*; *see also Matthews*, 319 F.3d at 788. "Circumstantial evidence alone is sufficient to support a conviction, and it is not necessary for the evidence to exclude every reasonable hypothesis except that of guilt." *Johnson v. Coyle*, 200 F.3d 987, 992 (6th Cir. 2000) (internal quotations and citations omitted); *see also Durr v. Mitchell*, 487 F.3d 423, 449

17

(6th Cir. 2007) ("circumstantial evidence is entitled to equal weight as direct evidence").

On federal habeas review, an additional layer of deference applies. *Brown*, 567 F.3d at 205; *see Coleman v. Johnson*, 566 U.S. 650, 651 (2012). First, the Court defers "to the trier-of-fact's verdict, as contemplated by *Jackson*." *Davis*, 658 F.3d at 531. And second, the Court defers under the 1996 Act to the state court's "consideration of the trier-of-fact's verdict." *Id*. So even if this Court would conclude in the first instance that a rational trier-of-fact could not have found Hill guilty beyond a reasonable doubt, the Court "must still defer to the state appellate court's sufficiency determination as long as it is not unreasonable." *Brown*, 567 F.3d at 205; *see also White v. Steele*, 602 F.3d 707, 710 (6th Cir. 2009). This doubly deferential "standard erects 'a nearly insurmountable hurdle' for petitioners who ... seek habeas relief on sufficiency-of-the-evidence grounds." *Keys v. Booker*, 798 F.3d 442, 450 (6th Cir. 2015) (quoting *Davis*, 658 F.3d at 534)).

With these principles in mind, it bears remembering that when reciting the factual history of Hill's case, the court of appeals noted that Hill and J.M. lived together and were in a relationship. *Hill*, 2024 WL 1718027, at *1. "During their relationship," several of J.M's friends "observed she had various injuries that caused them to be concerned for her safety." *Id*. These injuries included "a bruise and it was on the whole side of her face." *Id*. They also included a "bruise from [J.M.'s] buttocks down her entire leg," which she

18

"conceded that [Hill] caused … when he pushed her down a set of porch stairs." *Id*. And a friend witnessed an incident at a party in which Hill grabbed J.M. by her hair and pushed her. *Id*.

As to the night in question, Hill first said that he and J.M. stayed at a bar until 2:00 a.m. and that J.M. consumed six or seven Long Island iced teas. *Id*. But this wasn't true. Video evidence later established that they left the bar at 11:00 p.m. *Id*. And the bartender did not serve J.M. even one Long Island iced tea. *Id*. Indeed, later testing of J.M. showed that she had consumed about half of one alcoholic drink. *Id*. at *2.

Hill admitted that after arriving home that night, he and J.M. "got into it." *Id*. He claimed that J.M. fell while intoxicated and hit her head. *Id*. But the evidence showed that she was not intoxicated. *Id*. So Hill's explanation was false. According to Hill, when he woke up the next morning, he observed that J.M. "was in distress, snoring real loudly," and couldn't be roused. *Id*. Even so, Hill waited an hour or two before call 911. *Id*. And this delay was allegedly occasioned by the fact that he needed to charge J.M's phone for an unusually long period of time. *Id*. Once emergency services arrived, Hill's demeanor was surprising. *Id*. He was relaxed and rather unhelpful. *Id*.

An autopsy revealed multiple injuries. *Id*. at *3. On J.M's head, the medical examiner found three distinct injuries: one to the left side of her head, one to the back of her head, and one to the right side of her head. *Id*. He also found nineteen bruises to J.M.s trunk area, but could not give a definitive

19

count as to her extremities because in several areas the bruises were clustered.

*Id.* Some of these appeared new, and others appeared to be older and healing.

*Id.*

With this background in mind, here's what the Ohio court of appeals said about Hill's weight and sufficiency argument:

> {¶36} Appellant contends the jury heard inconsistent evidence about whether the victim had alcohol in her system at the time of her death, which if true would support his defense. Appellant says he took videos of J.M. stumbling around the house for the purpose of confronting her the next day about her drinking and her drunken behavior. Appellant also takes issue with the lack of a thorough investigation, particularly since the authorities failed to test evidence of possible drug use in the house.
>
> {¶37} The state responds that the blood alcohol testing completed at the hospital and again during the autopsy showed the equivalent of less than one alcoholic beverage was in J.M.'s system. Further, there was evidence that J.M. suffered three distinct injuries to her head (on the left, right, and back), thirty-one bruises/blunt trauma injuries, and contusions to her chest. Medical testimony showed that injuries of this nature could not be caused based on Appellant's theory that the victim fell once and hit her head on the toilet. The state also emphasizes Appellant's dilatory conduct after discovering the extent of J.M.'s condition.
>
> {¶38} Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other." (Emphasis deleted.) *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). It is not a question of mathematics, but depends on the effect of the evidence in inducing belief. *Id.* Weight of the evidence involves the state's burden of persuasion.

20

*Id.* at 390, 678 N.E.2d 541 (Cook, J. concurring). The appellate court reviews the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed. *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 220, citing *Thompkins*, at 387, 678 N.E.2d 541. This discretionary power of the appellate court to reverse a conviction is to be exercised only in the exceptional case in which the evidence weighs heavily against the conviction. *Id.*

{¶39} "[T]he weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 118, quoting *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. The trier of fact is in the best position to weigh the evidence and judge the witnesses' credibility by observing their gestures, voice inflections, and demeanor. *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984). The jurors are free to believe some, all, or none of each witness' testimony and they may separate the credible parts of the testimony from the incredible parts. *State v. Barnhart*, 7th Dist. No. 09 JE 15, 2010-Ohio-3282, ¶ 42, citing *State v. Mastel*, 26 Ohio St.2d 170, 176, 270 N.E.2d 650 (1971). When there are two fairly reasonable views of the evidence or two conflicting versions of events, neither of which is unbelievable, we will not choose which one is more credible. *State v. Gore*, 131 Ohio App.3d 197, 201, 722 N.E.2d 125 (7th Dist.1999).

{¶40} Beginning with the expert testimony, the state offered testimony from Dr. Chad Donley, the emergency room physician who treated J.M., and Dr. Felo, who performed the autopsy. The state also presented physical evidence in the form of blood alcohol testing results completed by the hospital shortly after J.M. arrived (both blood test and urine

21

test) and a blood test completed during Dr. Felo's autopsy. To counter this, Appellant offered testimony from Dr. Anthony Pizon, chief of the division of medical toxicology at the University of Pittsburgh Medical Center. However, this testimony was not based on separate testing, but was based on information provided by Appellant. Hence, the matter became a credibility issue for the jury.

{¶41} Dr. Pizon conceded at trial that he did not evaluate J.M. nor complete any independent testing, forcing him to rely on statements made by Appellant. Dr. Pizon testified that "[t]he picture painted for me sounds like a chronic alcoholic." (Trial Tr., p. 698.) However, he also stated that "if she is not a chronic alcoholic there is no way that she consumed that much alcohol" and that "drinking that much and not being a chronic alcoholic are incompatible." (Trial Tr., p. 699-700.)

{¶42} Dr. Felo contradicted Appellant's claim that J.M. was a chronic alcoholic through testing of her liver, which revealed no conditions associated with alcoholism. It was noted that her liver was healthy enough to be donated for a transplant. Dr. Pizon conceded that in looking at her medical information, "[t]here wasn't anything that, I don't think, stood out to me as the stigmata of an alcoholic." (Trial Tr., p. 702.)

{¶43} As to the three videos taken by Appellant of J.M. stumbling around the house the night before, Det. Stepuk testified that the videos did show J.M. stumbling, but did not indicate if it was due to intoxication or the result of head trauma. Dr. Pizon, Appellant's own expert, testified that it appeared to him that J.M. was slowly dying when those videos were taken.

{¶44} Even more significant than the alcohol testing, a reasonable jury could also have found that the pattern and extent of the injuries J.M. suffered were caused by intentional acts. The record contains evidence of inconsistent statements made by

Appellant of the events on the night of the incident. The record contains unrebutted evidence there was clearly a disturbance in the home that night. Officers found a broken mirror, broken knickknacks, and significant damage to the bedroom door. This provides evidence that a physical encounter took place.

{¶45} Appellant also has no explanation for the number of bruises on J.M.'s body, both fresh and healing. These do not support his story J.M. sustained a single fall. Dr. Felo testified that "[t]ypically you would need trauma to separate areas to cause [the injuries suffered by the victim] unless you were saying a rollover car crash or something like that, it would be uncommon that injury to the head would cause that injury to the chest as well." (Trial Tr., p. 381) The autopsy revealed J.M. sustained a plethora of bruises, abrasions, swelling, and internal bleeding inconsistent with a single fall.

{¶46} In addition, Appellant's conduct was not what would be expected under the circumstances. The record established that he waited at least an hour or two before calling for help despite J.M.'s serious condition, claiming that he needed to charge her phone before making the 911 call, and that she said (the previous evening) she did not want to go to the hospital. It is clear from the first responder's testimony that J.M. clearly required medical assistance. Once emergency help arrived, Appellant's demeanor was both more calm, and less forthcoming, than witnesses would have expected.

{¶47} Appellant also complains that the investigation was incomplete, as possible drug evidence found in the house was not tested. The only drugs found in J.M.'s system were administered at the hospital, and Appellant told police at the scene that drugs were not involved. Even if there were drugs in the house, it is equally plausible they belonged to Appellant. Unlike J.M., Appellant was not drug tested the day of the incident. Regardless,

23

> there was a plethora of evidence as to J.M.'s cause of death, none of it drug-related.
>
> {¶48} Accordingly, Appellant's third assignment of error is without merit and is overruled.

*Hill*, 2024 WL 1718027, at *7–9.

Given the above, Hill's argument doesn't leave the starting gate. He had a history of physically abusing J.M. During the night in question, he was alone with her. He lied about how long he was alone with her and her state of intoxication. And Hill waited a suspiciously long period of time before calling 911. Further, Hill's explanation for how J.M. sustained her injuries was unsupported by the facts. These facts together are sufficient to support Hill's conviction. *Cf. Johnson*, 200 F.3d at 991 (recounting that "Johnson is the last person known to have seen [his victim] alive" and that "[h]e was angry with her just after he saw her").

Against all of the above, Hill does almost nothing to overcome the double deference this Court owes to the court of appeals adjudication. Instead, he merely offers the unexplained, conclusory assertions that:

- The trial court gave inconsistent testimony about [a] statement petitioner gave to detective

- Trial court[']s evidence and witness testimony was conflicting, vague, uncertain, and fragmentary

- the witness's testimony [was] self-serving[4]

- There is zero direct or physical evidence tying petitioner to the crime

---

[4]    In his petition, Hill says that "None of the witness's testimony is self-serving." Hill presumably means that the witness's testimony was self-serving.

- Inconsistent toxicology and drug screen results

Doc. 1, at 8.

None of these assertions show that the evidence was constitutionally insufficient. For starters, the fact that any witness provided testimony that was inconsistent, either internally or with the testimony of other witnesses, is of no moment. *James v. Corrigan*, 85 F.4th 392, 397 (6th Cir. 2023) ("inconsistent testimony is a matter of credibility, not sufficiency"). This Court considers the evidence in the light most favorable to the prosecution, not in the light most favorable to Hill. *Johnson*, 200 F.3d at 991. Inconsistencies can happen in any trial and it is the jury's role—not this Court's—to sift through those inconsistencies. *James*, 85 F.4th at 397. The same is true of testimony that is conflicting, vague, uncertain, or fragmentary. *See Samatar v. Clarridge*, 225 F. App'x 366, 373 (6th Cir. 2007) ("in reviewing the sufficiency of the evidence claim, we must defer to the trier of fact with respect to issues of conflicting testimony, weight of the evidence, and the credibility of witnesses").

Further, whether a witness's testimony—and Hill doesn't bother to explain to whom he refers—was self-serving is matter for the jury to consider. While the allegedly self-serving nature of testimony might be fodder for cross-examination or closing argument, the fact that testimony might be self-serving does not make the evidence constitutionally insufficient. And it is simply irrelevant that the prosecution failed to present direct evidence of guilt.

25

Circumstantial evidence alone can support guilt. *Johnson*, 200 F.3d at 992. Finally, like any other evidence, whether toxicology and drug screen results were inconsistent—and Hill offers no basis to evaluate whether they were—is of no moment. The jury, not this Court, resolves evidentiary inconsistencies.

Hill's first ground for relief is not cognizable in part and otherwise meritless.

### 2. *Hill's second and fourth grounds for relief are not cognizable.*

In his second ground for relief, Hill argues that the trial court violated Ohio rule of evidence 404(B) by allowing the State to present evidence of prior bad acts. Doc. 1, at 10. Hill does not cite or rely on any principal of federal law to support this ground. He raised this issue before Ohio's courts purely as a matter of state law. *See* Doc. 9-1, at 62–66, 149–52.

In his fourth ground, Hill asserts that the trial court erred by admitting "duplicative and gru[e]some photographs of the victim over" Hill's objection. Doc. 1, at 14. As with his second ground, Hill does not cite or rely on any principal of federal law. Hill raised this issue before Ohio's courts, arguing that the admission of the referenced evidence violated Ohio rule of evidence 403. Doc. 9-1, at 74–76, 157–58.

The problem for Hill with regard to these two grounds is that state law issues are not cognizable in habeas. *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990); *Cress v. Palmer*, 484 F.3d 844, 853 (6th Cir. 2007). Rather, this Court "is limited to deciding whether a conviction violated the Constitution, laws, or

26

treaties of the United States alleged violations of state laws or rules." *Estelle v. McGuire*, 502 U.S. 62, 68 (1991).

It's true, as Hill states, Doc. 15, at 6–7, that "[w]hen an evidentiary ruling is so egregious that it results in a denial of fundamental fairness, [the ruling] may violate due process and thus warrant habeas relief." *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). But to rise to the level of a due process violation, a state-court evidentiary ruling must "offend[] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quoting *Montana v. Egelhoff*, 518 U.S. 37, 43 (1996), *in turn quoting Patterson v. New York*, 432 U.S. 197, 202 (1977)).

Hill, however, does not argue in his petition—and did not argue before the Ohio courts—that the errors he claims offended a fundamental principle of justice. *See* Doc. 1, at 10, 14; Doc. 9-1, at 149–52, 157–58. In his reply to his Motion to expand the record, Hill says that the trial court's evidentiary rulings "rise to the level of due process violations." Doc. 15, at 6. But Hill has not explained how in his case this occurred. He has therefore not made any argument that would cause the Court to conclude that these grounds for relief are cognizable for purposes of this federal habeas petition.

Hill's second and fourth grounds for relief are not cognizable.

27

    *3.    Hill's third ground for relief fails on the merits.*

In his third ground for relief, Hill argues that the trial court erred when it failed to "provide a fair cross section represen[t]ative of the community from the jury pool." Doc. 1, at 12. Hill raised this issue before the Ohio Supreme Court and the Ohio court of appeals. The latter Court rejected the argument:

> {¶19} Appellant argues that the jury *voir dire* in this matter excluded a distinctive portion of the community, as no African American jurors were included. Appellant contends that this is particularly problematic as he is of African American descent and accused of killing a white woman.
>
> {¶20} The state responds that when the issue was raised, the trial court summoned the assistant jury commissioner, who testified that the normal procedure to obtain a jury pool was followed in this case. The court requested that thirty potential jurors appear, and the commissioner sent thirty consecutively-numbered potential jurors to the courtroom. This process is a "blind" one – the commissioner would have no knowledge of any potential juror's race or ethnicity.
>
> {¶21} The racial makeup of a jury pool is contested through use of a "*Batson*" challenge, which has its genesis from United States Supreme Court law.
>
>> The Ohio Supreme Court has set out the steps for analyzing a race-based challenge pursuant to *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), as follows:
>>
>> First, the opponent of the peremptory strike must make a prima facie case of racial discrimination. Second, if the trial court finds that the opponent has fulfilled this requirement, then the proponent of the strike must come forward with a racially neutral

28

explanation for the strike. * * * The 'explanation need not rise to the level justifying exercise of a challenge for cause.' [*Batson*, 476 U.S.] at 97, 106 S.Ct. at 1723, 90 L.Ed.2d at 88.

Third, if the proponent puts forward a racially neutral explanation, the trial court must decide, on the basis of all the circumstances, whether the opponent has proved purposeful racial discrimination. * * * The burden of persuasion is on the opponent of the strike. (Internal citations omitted.)

*State v. Herring*, 94 Ohio St.3d 246, 255-256, 2002-Ohio-796, 762 N.E.2d 940; *State v. Moore*, 7th Dist. Mahoning No. 22 MA 0013, 2023-Ohio-1000, ¶ 14, appeal not allowed, 170 Ohio St.3d 1494, 2023-Ohio-2407, 212 N.E.3d 951.

{¶22} "An appellate court will not reverse the trial court's decision of no discrimination unless it is clearly erroneous." *Moore* at ¶ 15, citing *State v. Hernandez*, 63 Ohio St.3d 577, 583, 589 N.E.2d 1310 (1992).

{¶23} In this case, the *Batson* challenge did not arise from any attempt by the state to strike potential jurors. Instead, defense counsel raised a *Batson* challenge when the potential jurors entered the courtroom and counsel became aware no African Americans were included within the group. The trial court called Michele Caputo, assistant jury commissioner, to address the issue. Caputo explained to the court that while not typical, occasionally a jury pool will lack diversity. She explained that in the normal process, 500 summons are sent out to county citizens blindly, without any knowledge of their race or ethnicity. When a bailiff requests a jury, the bailiff will ask to be sent a specific number of potential jurors, in this case thirty. The jury commission office selects the first thirty potential jurors in sequential and numeric order, again having no knowledge of their race or ethnicity. She stated that the process used for this

29

case was the procedure normally used to generate a random group, and the fact that no African Americans were included is mere happenstance. Throughout this entire process, individual potential jurors are simply referenced as numbers until they appear in the courtroom.

{¶24} Again, the defense's objection was made to the jury pool before either party had begun *voir dire*. While this does not involve a typical *Batson* scenario, the same law applies. Beginning with the first prong of the *Batson* test, Appellant complains that despite being a large and distinctive group within the community, no African Americans were included among the potential jurors. The United States Supreme Court has held that the Sixth Amendment guarantee of a jury trial "contemplates a jury drawn from a fair cross-section of the community." *Taylor v. Louisiana*, 419 U.S. 522, 527, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975).

{¶25} While this is the ideal scenario, Ohio law provides:

> [N]o requirement that petit juries actually chosen must mirror the community and reflect the various distinctive groups in the population. Defendants are not entitled to a jury of any particular composition, but the jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof.

*State v. Johnson*, 88 Ohio St.3d 95, 117, 723 N.E.2d 1054, 1073 (2000), citing *Taylor, supra*, at 527. While the ideal situation is to have every jury pool reflect the diversity of the community, so long as the group at issue was not excluded based on race, Appellant does not properly raise a *Batson* challenge.

30

{¶26} As to the second prong, Appellant contends no reason was given as to why two people were excused from the jury pool. However, not only is Appellant unable to link the absence of these two individuals to some kind of systematic exclusion, it was defense counsel who stated on the record that those individuals were excused simply because they failed to appear. There is no way to determine their race. Regardless, the assistant jury commissioner provided a race neutral explanation for the racial makeup of this jury pool. "The challenge is defeated so long as discriminatory intent is not inherent in the explanation." *State v. Nixon*, 1st Dist. Hamilton No. C-020428, 2003-Ohio-3384, ¶ 19, citing *Purkett v. Elem*, 514 U.S. 765, 767-768, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995). There is nothing inherently discriminatory in a random process where the race of any potential juror is unknown until they appear in the courtroom.

{¶27} As to the third *Batson* prong, Appellant argues that it is impossible for any defendant to satisfy. We recently held that "underrepresentation or lack of representation of a group on a single jury does not constitute systematic exclusion." *State v. Haywood*, 7th Dist. Columbiana No. 21 CO 0035, 2023-Ohio-1121, ¶ 44; citing *State v. Bryan*, 101 Ohio St.3d 272, 2004-Ohio-971, 804 N.E.2d 433, ¶ 113; *State v. McNeill*, 83 Ohio St.3d 438, 444, 700 N.E.2d 596 (1988). Thus, a defendant must show some indicia of exclusion before merely alleging underrepresentation or lack of representation. Appellant had no evidence to support an indicia of purposeful race-based discrimination.

{¶28} Because the assistant jury commissioner provided a race neutral reason for the racial makeup of the jury pool, and the lack of diversity in a single jury, alone, does not provide evidence of systematic exclusion, Appellant's first assignment of error is without merit and is overruled.

*Hill*, 2024 WL 1718027, at *4–5.

31

Hill's ground three claim fails at the threshold because he ignores the court of appeals' decision and his burden. He makes no argument that the court of appeals' decision was contrary to or involved an unreasonable application of relevant Supreme Court precedent. *See* Doc. 1, at 12; *see also* 28 U.S.C. § 2254(d)(1). And he makes no argument that the court of appeals' decision involved an "unreasonable application of the facts." *See* Doc. 1, at 12; *see also* 28 U.S.C. § 2254(d)(2). These requirements in Section 2254(d) are notably not mere suggestions that a court can simply ignore. *See Blackmon v. Booker*, 696 F.3d 536, 557 (6th Cir. 2012) (chiding a district court for "ignor[ing] the myriad of limitations that § 2254(d)(1) imposed on its review"). Rather, section 2254(d) places "a heavy burden for a petitioner to overcome." *Tibbetts v. Bradshaw*, 633 F.3d 436, 442 (6th Cir. 2011).

Rather than trying to meet his burden Hill simply recites three factual assertions. By merely reciting three factual assertions, Hill fails to overcome the deference this Court owes to the court of appeals' decision. *See* 28 U.S.C. § 2254(d).

But even if Hill had attempted to carry his burden, the result would be the same. Hill identifies no Supreme Court decision that the court of appeals misapplied. And he identifies no precedent that would support the idea that a venire from which a particular jury is chosen must have a particular composition. Rather, the relevant rule, which the Ohio Supreme Court cited and applied, *Hill*, 2024 WL 1718027, at *4–5, is that "venires from which juries

32

are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative therefor.'" *United States v. Dunnican*, 961 F.3d 859, 879–80 (6th Cir. 2020) (quoting *Taylor v. Louisiana*, 419 U.S. 522, 538 (1975)). Hill does not explain how—or claim that—the court of appeals misapplied this rule.

Moreover, presenting a prima facie case of underrepresentation of a particular group in jury selection, requires a criminal defendant to show three predicates:

> (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Duren v. Missouri*, 439 U.S. 357, 364 (1979). Had he tried to show in his petition that he attempted to carry this burden before Ohio's courts, Hill would fail. As the Ohio court of appeals noted, the trial court's assistant jury commissioner testified that African-Americans were not systematically excluded from jury pools. *Hill*, 2024 WL 1718027, at *4. Indeed, she said that it was atypical for a jury pool to "lack diversity." *Id.* Hill points to nothing to rebut this testimony.

Further, the assistant jury commissioner explained that the selection process involved "blindly" issuing 500 summonses "without any knowledge of

33

the[] race or ethnicity" of the summoned citizens. *Id*. Hill also offers nothing to rebut this testimony.

Given the unrebutted testimony on which the court of appeals relied, Hill cannot show either the second or third *Duren* predicates. Hill's third ground thus fails on the merits.

### Conclusion

For all the above reasons, the Court should deny Hill's petition.

Dated: March 11, 2026

/s/*James E. Grimes Jr.*

James E. Grimes Jr.
U.S. Magistrate Judge

### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530–31 (6th Cir. 2019).